IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

FILED
AUG - 9 2018
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERCIA ) | |
| ) | Case No. 1:18-mj-387 |
| v. ) | |
| ) | The Hon. Ivan D. Davis |
| DAMON LEE WOODS, ) | |
| ) | |
| Defendant. ) | |

### AFFIDAVIT IN SUPPORT OF A
### CRIMINAL COMPLAINT AND ARREST WARRANT

I, Kendrah Peterson, being duly sworn, depose and state as follows:

### INTRODUCTION

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since 2006. I am currently assigned to Enforcement Group Forty-Four at the Washington Division Office, located in the District of Columbia.

2. While with the DEA, I have participated in the investigation of narcotics traffickers and possessors. Many of these investigations led to the arrest and conviction of narcotics dealers and money launderers. In the course of conducting these investigations, I have used several different kinds of investigative techniques, including: interviewing informants and cooperating sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants, which have led to substantial seizures of narcotics, firearms, contraband, and drug related assets; and, the analysis of financial documents and

records.

3. This affidavit is being submitted in support of a criminal complaint charging DAMON LEE WOODS ("WOODS") with conspiracy to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

4. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and information obtained from other state and federal law enforcement officers. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

5. This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

6. During the course of this investigation, investigators have used seven cooperating sources (hereinafter, "CS-1" through "CS-7"). For purposes of this affidavit, all cooperating sources will be referred to in the masculine gender regardless of their true gender. The information provided by all of the cooperating sources has been corroborated by consensually monitored telephone calls, text messages, and other means. To my knowledge, none of the information provided by any cooperating sources has proved to be false, misleading, or inaccurate in any material respect.

7. CS-1 started cooperating with law enforcement in 2015. CS-1 is an

admitted drug user and has a prior drug trafficking conviction. CS-1 is cooperating with law enforcement in hopes of receiving credit for cooperation after pleading guilty to a federal drug trafficking charge.

8. CS-2 started cooperated with law enforcement in 2017. CS-2 is an admitted drug user and one prior drug possession arrest. CS-2 agreed to cooperate after being approached by law enforcement for his involvement in assisting others in obtaining methamphetamine in hopes of consideration in regards to potential charges.

9. CS-3 started cooperating with law enforcement in 2015. CS-3 is an admitted drug user and has a prior drug possession conviction. CS-3 is cooperating with law enforcement in hopes of receiving credit for cooperation after pleading guilty to a federal drug trafficking charge.

10. CS-4 started cooperating with law enforcement in 2016. CS-4 is an admitted drug user with no prior criminal history. CS-4 is cooperating with law enforcement in hopes of receiving credit for cooperation after pleading guilty to a federal drug trafficking charge.

11. CS-5 started cooperating with law enforcement in 2014. CS-5 is an admitted drug user and has a prior drug trafficking and assault convictions. CS-5 is cooperating with law enforcement in hopes of receiving credit for cooperation after pleading guilty to a federal drug trafficking charge.

12. CS-6 started cooperating with law enforcement in 2015. CS-6 is an admitted drug user and has a limited prior criminal history involving traffic offenses. CS-6 is cooperating with law enforcement in hopes of receiving credit for cooperation after pleading guilty to a federal drug trafficking charge.

13. CS-7 started cooperating with law enforcement in 2017. CS-7 is an admitted drug user and has a prior drug possession conviction. CS-7 is cooperating with law enforcement in hopes of receiving credit for cooperation for pending federal drug trafficking charges.

## **PROBABLE CAUSE**

### Background of Investigation

14. In or around 2012, law enforcement officers obtained information that a group of individuals were distributing large quantities of methamphetamine throughout the Washington, D.C. Metropolitan area. This group utilized, and often shared, sources of supply for multiple-ounce quantities of methamphetamine, which they further distributed to customers throughout the Washington D.C. Metropolitan area, including in the Eastern District of Virginia. Law enforcement also learned that these individuals utilized various mailing services (i.e. USPS, UPS, DHL, and FedEx) to ship methamphetamine to the Eastern District of Virginia and elsewhere. Law enforcement has identified Damon WOODS as part of this group.

## **LAW ENFORCEMENT SEIZURE OF APPROXIMATELY TWO (2) POUNDS OF SUSPECTED CRYSTAL METHAMPHETAMINE IN WASHINGTON D.C. ON JULY 29, 2015**

15. On or about July 29, 2015, law enforcement intercepted a FedEx package that was mailed from California, to CS-1 and WOODS at the Hotel Palomar, located at 2121 P Street NW, Washington, D.C. This package entered the Eastern District of Virginia through Dulles International Airport. Law enforcement obtained and executed a search warrant on the package, resulting in the discovery of approximately two (2) pounds of suspected methamphetamine. Law enforcement conducted a controlled delivery of the package. This resulted in an encounter with CS-1 and WOODS, who law enforcement detained when they attempted to obtain the package.

4

Laboratory analysis confirmed that the package contained approximately 884 grams of actual methamphetamine.

## ARREST AND INTERVIEW OF CS-1 ON JULY 29, 2015

16. CS-1 was detained and later arrested. CS-1 agreed to speak with law enforcement. During the interview, CS-1 admitted that he had a "crew" of sub-distributors of the methamphetamine he provided. CS-1 identified WOODS as part of this "crew" and occasional source of supply of methamphetamine. CS-1 also stated that Lewis HERNANDEZ, of California, supplied the methamphetamine that law enforcement seized.

17. CS-1 stated that in and around 2014, WOODS supplied CS-1 with multiple ounce quantities of crystal methamphetamine. CS-1 stated that during that time, WOODS utilized a source of supply located in Atlanta, Georgia.

18. CS-1 stated that he purchased up to four (4) ounces of methamphetamine on at least two (2) occasions from WOODS for further distribution in the Washington Metropolitan Area. During that time, WOODS also used other sources of supply for methamphetamine located in Baltimore, Maryland, and Chicago, Illinois. On at least one occasion, CS-1 accompanied WOODS to Chicago, Illinois, to obtain methamphetamine. CS-1 observed WOODS with approximately two (2) pounds of suspected crystal methamphetamine on at least two (2) occasions.

19. According to CS-1, in 2014 he provided WOODS with $12,000 to purchase twelve (12) ounces of methamphetamine from suppliers in Georgia. CS-1 told law enforcement that he did not like the quality of this methamphetamine. According to CS-1, WOODS then arranged for CS-1 to speak with, and ultimately meet, the Georgia methamphetamine supplier. CS-1 stated that he eventually met the Georgia source of supply traveled to, who provided CS-1

with a better quality methamphetamine.

20. In early 2015, CS-1 began to obtain large quantities of methamphetamine from various suppliers in California, which he supplied to WOODS. CS-1 stated that WOODS was supplying methamphetamine to customers in Washington, D.C., Maryland, and Virginia.

21. In and around July 2015, CS-1 traveled to California to arrange the shipment of methamphetamine that he intended to distribute to his "crew" in the Washington Metropolitan area. CS-1 gave his supplier $7,000 for approximately one (1) pound of methamphetamine. CS-1 arranged to have the methamphetamine shipped in two separate packages. Specifically, CS-1 arranged for one package, containing approximately a ½ pound of methamphetamine, to be shipped to WOODS in Philadelphia, Pennsylvania. CS-1 arranged for the other ½ pound to be shipped to CS-5 in Washington, D.C.

22. Law enforcement served an administrative subpoena to FedEx for shipment records. Those records showed that a package was mailed from California to the Wyndham Philadelphia Historic District, C/O Damon WOODS, on July 16, 2015.

**INTERVIEW OF DAMON WOODS ON JULY 29, 2015**

23. On July 29, 2015, law enforcement interviewed WOODS after advising him of his rights against self-incrimination. During the interview, which was recorded, WOODS admitted to purchasing quantities of methamphetamine ranging from ounces and pounds from a source of supply in Baltimore, Maryland. WOODS also admitted to sending $8,000 to a source of supply in Georgia in 2014 to purchase one (1) pound of methamphetamine. WOODS stated that he never received the methamphetamine that he was attempting to purchase on that occasion.

24. Law enforcement reviewed the contents of a notebook, which contained "owe sheets" outlining money spent or owed by suspected methamphetamine customers. The

6

following entry was located in the notebook: "Wells Fargo 3283662041, Lewis Hernandez, 5717 Virginia Avenue, Apt. 104, Los Angeles, CA 90038". I believe this corroborates CS-1's statement that HERNANDEZ is a California-based methamphetamine source of supply.

**COMMUNICATIONS BETWEEN CS-1 AND WOODS FROM PHONE DOWNLOADS**

25. In July 2015, CS-1 consented to a search of his phones. This revealed communications corroborating CS-1's statements that he conspired with WOODS to distribute methamphetamine. CS-1 communicated with WOODS at damonwoodsinc@icloud.com. The following table identifies communications between CS-1 and WOODS regarding the purchase of methamphetamine.

| DATE | FROM | MESSAGE |
|---|---|---|
| 7/17/2015 | WOODS | Do you have the tracking number? |
| 7/17/2015 | CS-1 | No sir said he made it in time. |
| 7/17/2015 | WOODS | What does that mean? |
| 7/17/2015 | CS-1 | Sorry don't have tracking number but he said packages were shipped. |
| 7/17/2015 | CS-1 | Intake tiny gotnyour delivery as well. |
| 7/17/2015 | CS-1 | Lp lease save me a half oz thanks |
| 7/17/2015 | WOODS | Hey baby, I did and was gonna text you and say, thanks! |
| 7/17/2015 | WOODS | Muah. How's your travels? I'll start sending you money immediately |
| 7/17/2015 | CS-1 | That's what the half oz for to say thanks we will talk when I get home about how this can continue |
| 7/17/2015 | WOODS | When you coming home? |
| 7/17/2015 | CS-1 | Starting to look now since u guys have packages |

26. Through my knowledge of this investigation and discussions with CS-1 and CS-5,

I believe that in the above table of messages, WOODS and CS-1 are discussing methamphetamine packages that were shipped.

27. On July 19, 2015, WOODS wrote the following message to CS-1:

| DATE | FROM | MESSAGE |
|---|---|---|
| 07/19/15 | WOODS | Im out of town until Tuesday, though making money (mostly yours) but when I get home, I can devote 24 hours a day until it's livable. I am about to meet mark from New York here in Atlantic city to sell him some shit. Ryan and I had a bit of a falling out, so I am kinda solo, can you train up? |

28. Through my knowledge of this investigation and discussions with CS-1, I believe WOODS is discussing the distribution of methamphetamine that CS-1 shipped to WOODS.

## HISTORICAL INFORMATION PROVIDED BY CS-2

29. In 2015, law enforcement arrested CS-2 on federal drug trafficking charges in the Eastern District of Virginia. CS-2 was member of CS-1's "crew" and personally observed WOODS obtain methamphetamine from CS-1 and others on several occasions in 2015. CS-2 confirmed that WOODS introduced CS-1 to his sources of supply for methamphetamine in Atlanta, Georgia. CS-2 had personal knowledge that WOODS was also obtaining large quantities of methamphetamine from at least one supplier in Baltimore, Maryland. CS-2 was present when WOODS distributed crystal methamphetamine to various customers. CS-2 stated that WOODS was "working with and for" CS-1 in the distribution of methamphetamine.

## HISTORICAL INFORMATION PROVIDED BY CS-3

30. In 2015, CS-3 was arrested for federal drug trafficking charges in the Eastern District of Virginia. CS-3 purchased quantities of methamphetamine from WOODS and CS-1 on numerous occasions. Specifically in late 2014, CS-3 purchased "8-ball" quantities of crystal methamphetamine from WOODS on at least three (3) occasions. CS-3 began purchasing ½

ounce quantities of crystal methamphetamine on a weekly basis for several months from CS-1 and WOODS. CS-3 increased from ½ ounce quantities to approximately two (2) ounces of crystal methamphetamine one (1) to two (2) times per week for at least one month. By the end of 2014, CS-3 observed WOODS with approximately one (1) pound of suspected crystal methamphetamine on approximately five (5) occasions.

### HISTORICAL INFORMATION PROVIDED BY CS-4

31. In 2015, CS-4 was arrested in the Eastern District of Virginia for federal drug trafficking charges. CS-4 was a methamphetamine customer of WOODS. CS-4 met WOODS on "BBRT" in approximately 2015. CS-4 was regularly purchasing gram amounts of crystal methamphetamine from WOODS, usually meeting him at his apartment on Massachusetts Avenue in Washington, D.C. CS-4 observed WOODS and CS-1 with approximately one (1) pound of suspected crystal methamphetamine on at least one (1) occasion. CS-4 was also aware that CS-6 and CS-7 were obtaining methamphetamine from WOODS for further distribution.

### CONTROLLED PURCHASE FROM CS-7 ON JUNE 17, 2015

32. On or about June 17, 2015, under the direction and supervision of law enforcement, CS-4 purchased a quantity of methamphetamine from CS-7 in Washington, D.C. During the transaction, CS-7 told CS-4 that the methamphetamine was supplied by WOODS. The substance purchased was analyzed by the DEA Mid-Atlantic Laboratory was identified as methamphetamine weighing 10.4 grams.

### HISTORICAL INFORMATION PROVIDED BY CS-5

33. In July 2016, CS-5 was arrested in the Eastern District of Virginia for federal drug trafficking charges. CS-5 stated he and WOODS were part of CS-1's "crew" and was a source of supply for methamphetamine on occasion.

34. CS-5 began purchasing methamphetamine from CS-1 and WOODS in early 2014. CS-5 regularly obtained between ½ and one (1) ounce quantities of crystal methamphetamine from WOODS and CS-1 several times per week until July 2015. During this period, CS-5 observed WOODS with up to two (2) pounds of suspected methamphetamine on at least five (5) occasions. CS-5 stated that WOODS initially traveled to Atlanta, Georgia to obtain large amounts of crystal methamphetamine for further distribution in the Washington Metropolitan area. CS-5 knew that WOODS introduced CS-1 to the Georgia methamphetamine suppliers. CS-5 was also aware that CS-1 accompanied WOODS to Chicago, Illinois to obtain a large quantity of crystal methamphetamine on one (1) occasion.

35. According to CS-5, WOODS "took over" CS-1's methamphetamine customers after CS-1 was arrested, including several in the Eastern District of Virginia. CS-5 stated that WOODS was close with CS-7 and often traveled to New York and Philadelphia, Pennsylvania, to pick up large quantities of methamphetamine to bring back to the Washington Metropolitan area for further distribution.

### HISTORICAL INFORMATION PROVIDED BY CS-6

36. In 2016, CS-6 was arrested in the Eastern District of Virginia for federal drug trafficking charges. CS-6 stated that he, CS-5, CS-7, and WOODS were part of the "crew" run by CS-1. CS-6 was aware that CS-1 and WOODS traveled to Atlanta, Georgia, in 2014 to obtain large amounts of methamphetamine from suppliers that had been utilized primarily by WOODS. CS-6 was also aware that in 2014, WOODS and CS-1 flew to Chicago, Illinois, with

approximately $60,000 to obtain a large quantity of methamphetamine and GHB to bring back to the Washington Metropolitan area for further distribution.

37. CS-6 knew that CS-7 regularly distributed methamphetamine that was supplied by WOODS. According to CS-6, WOODS admitted that he received packages from CS-1 containing methamphetamine.

## LAW ENFORCEMENT SEIZURE OF $15,000 ON FEBRUARY 11, 2017

38. On or about February 11, 2017, at Reagan National Airport in Arlington, Virginia, law enforcement officers encountered WOODS at an airport security checkpoint while attempting to board a flight to California. A check of WOODS' luggage revealed drug paraphernalia and $15,000. A law enforcement K-9 trained in the detection of controlled substances "alerted" on the money.

## HISTORICAL INFORMATION PROVIDED BY CS-7

39. In August 2017, law enforcement encountered CS-7 in Washington, D.C. and seized approximately three (3) ounces of suspected crystal methamphetamine and cash. CS-7 agreed to speak with law enforcement. CS-7 admitted that began to obtain methamphetamine from CS-1 and WOODS in early 2014. Initially, WOODS was supplying CS-1 with approximately one (1) ounce of crystal methamphetamine per week for further distribution. WOODS then introduced CS-1 to his sources of supply in Atlanta, Georgia. CS-7 also stated that WOODS obtained large quantities of methamphetamine from suppliers in New York and California. Following CS-1's arrest in July 2015, CS-7 purchased methamphetamine directly from WOODS for personal use and further distribution. CS-7 maintained this relationship with WOODS until sometime in 2018.

40. In late 2017, CS-7 met a source of supply in New York that provided him with

11

pound quantities of methamphetamine, which he re- distributed in the Washington Metropolitan area. During that time, on at least two (2) occasions, WOODS purchased one (1) to two (2) ounces of crystal methamphetamine from CS-7 for further distribution. CS-7 stated that WOODS only purchased from him on those occasions because he normally received methamphetamine from his own suppliers. CS-7 also reported that WOODS and other unindicted co-conspirators "pooled" money to purchase methamphetamine from the New York source of supply. CS-7 admitted that he communicated with WOODS on his cellular phones and at his e-mail account: damonwoods1980@gmail.com, which was found stored on CS-7's phone.

**COMMUNICATIONS BETWEEN CS-7 AND WOODS FROM PHONE DOWNLOADS**

41. In August 2017, CS-7 consented to a search of his phones, which revealed communications corroborating CS-7's statements that he conspired with WOODS to distribute methamphetamine. The following table of messages include conversations between CS-7 and WOODS about suspected drug trafficking. WOODS used phone number 202-390-9874. An open source search of Facebook revealed that this telephone number was associated with a Facebook account under the name "Damon Woods".

| DATE | FROM | MESSAGE |
|---|---|---|
| 7/10/2017 | CS-7 | Figure out the dollar situation? |
| 7/10/2017 | WOODS | Sorry. I'm about to get my ass to where I need to go to collect $ |
| 7/10/2017 | CS-7 | Cool. I'm not going until Wednesday now. Helps us all acquire some more funds for the cause. |
| 7/11/2017 | CS-7 | When is good for me to collect? Im in Alexandria right now and I won't be leaving for about 45-hr |

42. Based on my knowledge of this investigation and through discussions with CS-7,

12

I believe that in the above table of messages, WOODS and CS-7 discussed collecting money owed from methamphetamine sales

43. On July 24, 2017, CS-7 and WOODS exchanged the following text messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 7/24/2017 | CS-7 | I'm going up to NY this afternoon |
| 7/24/2017 | CS-7 | Did you need anything? |
| 7/24/2017 | WOODS | No. I am still sitting on a lot. |

44. Based on my knowledge of this investigation and through discussions with CS-7, I believe that in the above table of messages, CS-7 wrote that he is traveling to New York to obtain methamphetamine. WOODS replied "No. I am still sitting on a lot." I believe WOODS did not need more methamphetamine from CS-7 because WOODS was already in possession of a large quantity of methamphetamine.

45. On July 28, 2017, CS-7 and WOODS exchanged the following text messages.

| DATE | FROM | MESSAGE |
|---|---|---|
| 7/28/2017 | CS-7 | I see. I have some killer product for sampling. Long visit with the landlady. |
| 7/28/2017 | WOODS | I may have to go on without you, though I wanted to get a couple of oz from you. |
| 7/28/2017 | WOODS | But have to deliver to Arlington before 4, so may need to go on ahead. |
| 7/28/2017 | CS-7 | This is the absolute best I've ever had it's not been touched or cut with anything sen |
| 7/28/2017 | WOODS | Wondering at the possibility of turning this into that 1/3. |

46. Based on my experience, knowledge of this investigation and through discussions

with CS-7, I believe that in the above table of messages, WOODS and CS-7 discussed financing for two (2) ounces of crystal methamphetamine.

**COMMUNICATIONS BETWEEN UCC-1 AND WOODS FROM PHONE DOWNLOAD**

47. On August 17, 2017, law enforcement arrested a subject in Washington, D.C. on an outstanding warrant. This subject, hereinafter referred to as unindicted co-conspirator (UCC-1), was found in possession of over 200 grams of suspected methamphetamine and a Coolpad cellular phone. Law enforcement obtained a search warrant to download the contents of the Coolpad. The Coolpad had e-mails from damonwoods1980@gmail.com to an additional unindicted co-conspirator, hereinafter referred to as UCC-2. The following table identifies communications between UCC-2 and WOODS regarding the purchase of methamphetamine. These messages include suspected drug conversations and not every message found.

| DATE | FROM | MESSAGE |
|---|---|---|
| 08/15/17 | UCC-2 | Hey Damon. So Ira's connect in CA magically came through and sent my package and I picked it up. Seems decent. I very much doubt that he even has a CA connect. I asked him about John's stuff and he wrote me a confide I got a video of it which I will share with you on Google drive. |
| 08/15/17 | WOODS | What kind pf quantities do you think ira can come up with? |
| 08/15/17 | UCC-2 | I'm not sure. You mean with or without money? He got 3 pounds the first time. Are you asking for a specific reason or out of curiosity? |
| 08/16/17 | WOODS | I'm asking because if he can come up with our product, why can he not come up with johns? What are his capabilities for producing product comparable to the amount owed on his end? |

48. Based on my training and experience and knowledge of this investigation, I

14

believe that in the above table of messages, WOODS and UCC-2 are discussing receiving multiple pounds of methamphetamine from a source of supply that both subjects are dealing with. UCC-2 later confirmed with law enforcement that WOODS utilized his electronic devices and was the user of damonwoods1980@gmail.com.

## LAW ENFORCEMENT SEIZURE OF CRYSTAL METHAMPHETAMINE FROM WOODS ON OCTOBER 21, 2017

49. On October 21, 2017, law enforcement officers conducted a traffic stop in Fairfax County, Virginia, for several violations. WOODS was identified as the driver and sole occupant of the vehicle. A check found that there was an outstanding warrant for WOODS and he was taken into custody. A search of the vehicle was conducted and a small quantity of suspected methamphetamine was seized. Law enforcement conducted a preliminary field-test which resulted in a positive response for methamphetamine.

## **CONCLUSION**

50.   Based upon the foregoing, I believe probable cause exists that from in and around 2014 to in around the present, within the Eastern District of Virginia and elsewhere, DAMON LEE WOODS, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with others, both known and unknown, to unlawfully, knowingly, and intentionally distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 846.

Kendrah Peterson
Special Agent
Drug Enforcement Administration

Sworn and subscribed to before me the 9th day of August 2018.

_____/s/_____
Ivan D. Davis
United States Magistrate Judge